## IN THE COURT OF APPEALS OF IOWA

No. 16-1734
Filed February 22, 2017

**IN THE INTEREST OF F.K.,**
**Minor child,**

**A.K., Father,**
      Appellant.
_____

Appeal from the Iowa District Court for Poweshiek County, Rose Anne Mefford, District Associate Judge.

The father appeals from the juvenile court order terminating his parental rights to his minor child. **AFFIRMED.**

Michael S. Fisher of Fisher Law Office, Oskaloosa, for appellant father.

Thomas J. Miller, Attorney General, and Janet L. Hoffman, Assistant Attorney General, for appellee State.

Jane K. Odland of Odland Law Firm, P.L.L.C., Newton, guardian ad litem for minor child.

Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**POTTERFIELD, Presiding Judge.**

The father appeals from the juvenile court's order terminating his parental rights to his child, F.K.[1] The father maintains there is not clear and convincing evidence F.K. could not be returned to his care at the time of the termination hearing and the closeness of the parent-child bond weighs against termination.

**I. Background Facts and Proceedings.**

The Iowa Department of Human Services (DHS) first became involved with the family in April 2015, due to allegations the parents were using methamphetamine while caring for the minor child. F.K. was adjudicated a child in need of assistance and removed from the mother's care on April 27, 2015. At the time, the father was considered the more stable parent—he had been able to provide a "clean" urinalysis—and F.K. was placed in his care with ongoing DHS supervision.

F.K. remained in the father's care until August 12, 2015, when she was removed because the father lacked stable housing and employment, and he was not engaged with DHS and the recommended services—including not completing requested drug tests.

F.K. was returned to her father's care in December 2015. The father had found housing on his grandparents' property, obtained employment, and once again provided a clean drug screen. However, the stability was again short-lived, and F.K. was removed from her father's care for the final time on February 9, 2016. The final removal occurred after the father refused to have a drug patch placed on him. Additionally, DHS was struggling to contact the father; he rarely

---

[1] The mother's parental rights were also terminated. She does not appeal.

stayed at his purported home on the grandparents' property and he was "unreachable" by phone. It was unclear where the father was staying with F.K. and who he was allowing to be around and care for the child.

After F.K. was removed in February, the father oscillated between claiming he was "done trying" and demanding immediate visits with F.K. from DHS. The social worker described him as volatile and testified the father would sometimes leave her voicemails in the middle of the night. The father did not present himself for a single DHS-requested drug test between the February removal and the termination hearing on August 26.

Following a May 2016 visit, F.K. reported that her father had a gun in his backpack during their visit and that he told her he was going to "kill all the bad people." When questioned about it, the father reported he had a tool from work in his bag—a "paint gun" used in auto body repairs—and denied making any threatening comments. Approximately one week later, the mother called the social worker and reported the father had started making threats toward the maternal grandmother—with whom F.K. had been placed after the removal. DHS filed a motion with the court to have visits suspended, and following a dispositional review hearing on June 9—where the motion went unresisted—visits were suspended. Visits were to begin again after the father completed substance-abuse and mental-health evaluations and began following any recommendations contained in those evaluations.

The father completed the mental-health evaluation in late June. The evaluation found that the father was "stable" but noted that he was "agreeable to ongoing counseling." The father never sought counseling afterward.

Additionally, there were questions about how truthful he was during the evaluation, as the notes of the evaluator stated the father denied alcohol use, illegal drug use, and prescription drug use.

The father completed a substance-abuse evaluation on July 6. Based on his self-reported usage of marijuana and alcohol, the evaluation recommended the father complete extended outpatient treatment. The father did not begin doing so before he voluntarily returned for another evaluation on July 18. When he returned, the father told the evaluator he had been dishonest before, admitted he had been using amphetamines, and asked for inpatient treatment. The evaluator changed the recommendation to inpatient, and the father was able to begin the treatment on August 9.

The father attended the termination hearing on August 26; he reported he had been discharged after successfully completing the program the night before the hearing. Although confirmation was not available at the time of the hearing, within a few days, the father submitted a letter from the treatment provider confirming he had successfully completed the program.

At the termination hearing, the father denied using methamphetamine or amphetamines. He maintained his "drug of choice" was marijuana and admitted that he had a problem with alcohol. When asked why he reported on July 18 to the evaluator that he had been using amphetamines, the father denied doing so. Later, when asked again, he stated he "may have said that just to get into inpatient treatment and rehab," and claimed he "[m]ade it sound more severe than it was, actually." Additionally, the father was asked about a police report from July 13, which stated the father had been found sleeping or passed out in a

car at 8:00 a.m. with white powder on his face and a drug grinder with "white residue" in the vehicle with him. The father denied the grinder was a drug grinder, and he claimed the white powder on his face was actually dried diaper rash cream that he uses to sooth the rash he had from "being saturated with metals" at his job three years prior.

The juvenile court terminated the father's parental rights pursuant to Iowa Code section 232.116(1)(h) (2016).

The father appeals.

## II. Standard of Review.

"In termination-of-parental-rights cases, we review the proceedings de novo." *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). Although we are not bound by them, we give the juvenile court's findings of fact weight—especially in assessing witness credibility. *Id.*

## III. Discussion.

The juvenile court terminated the father's parental rights pursuant to section 232.116(1)(h).[2] Here, the father only challenges the final element—the court's determination there was clear and convincing evidence F.K. could not be returned to the father's care at the time of the termination hearing. *See* Iowa

---

[2] Section 232.116(1)(h) allows the court to terminate if it finds by clear and convincing evidence all of the following:
      (1) The child is three years of age or younger.
      (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
      (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
      (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

Code § 232.116(1)(h)(4); *see also In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) ("At the time of the termination hearing, there was clear and convincing evidence the children could not be returned to the care of [the parent]."). He claims the child could be returned because he has an appropriate and safe home; followed through with DHS's recommendations; and cooperated with family safety, risk, and permanency services.

We believe the record belies the father's assertions. The father was discharged from substance-abuse treatment less than twenty-four hours before the termination hearing. At the hearing, he testified he was unsure where he would be staying going forward. He had a short-term plan to stay at the home of his aunt, but he was unsure what town he would even be living in after that. He testified his aunt's home was safe and appropriate, but DHS had not confirmed these statements. Additionally, the father did not have his driver's license; it had been suspended due to driving at excessive speeds and he could not have it reinstated until—according to the father's testimony—September 2016. The father's lack of stability was still an ongoing issue at the time of the hearing.

The father's visits had never resumed after their suspension on June 9, so he had not seen F.K. for almost three months at the time of the termination. Moreover, because of his very recent discharge from treatment, the father had not yet established he was able to maintain his sobriety for any length of time. Like the juvenile court, we do not find the father's testimony about the July 13 incident or his claims that he never used amphetamines to be credible. This, in turn, leads us to question whether the father resolved his issues with substance abuse. *See, e.g.*, *In re A.B.*, 815 N.W.2d 764, 776 (Iowa 2012) (stating that the

father's "drug problem was unresolved" and thus he was "not in a position to provide a safe and stable home" where the father continued to deny his drug use in spite of credible evidence to the contrary).

We agree with the juvenile court that F.K. could not be returned to the father's care at the time of the termination hearing.

The father also maintains that termination of his parental rights was not in F.K.'s best interests because of the closeness of their bond. *See* Iowa Code § 232.116(2) ("[T]he court shall give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child.), (3)(c) (stating the court need not terminate if "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship"). While the father and the child are bonded, there is nothing in the record that suggests the child would be harmed by the termination of the father's rights. *See In re D.W.*, 791 N.W.2d 703, 709 (Iowa 2010) ("[O]ur consideration must center on whether the child will be disadvantaged by termination, and whether the disadvantage overcomes [the parent's] inability to provide for [the child's] developing needs.").

Permanency and stability are in F.K.'s best interests, and the maternal grandmother and step-grandfather can provide that. They are willing to adopt F.K. and have enrolled in the necessary classes to begin the process. Even the father conceded the grandmother took excellent care of F.K. and that she had often been responsible for caring for F.K. even before DHS became involved with

the family.  When the social worker was asked how F.K. was doing in her placement at the maternal grandmother's, she testified:

> [F.K.] is very, very happy there.  She's well-adjusted.  She has all of her needs met.  She has her own room with lots and lots of toys.  She loves her "Gaga" and [step-grandfather].  She loves to ride her bike and is just happy and well-cared for and loved.
>
> Q: What other supports play a role in her life when she's with them?  A. Lots of extended family members.  She also has a half-sibling on [mother's] side.  The contact is made through [maternal grandmother] and [step-grandfather], as well, with that half-sibling.  I mean, they have a lot of extended family support.  They also have childcare in place, and she's starting preschool—well, she calls it "preschool"—in the community, so she is visible in the community now, so there are a lot of supports there.

Termination of the father's parental rights is in F.K.'s best interests.  We affirm.

**AFFIRMED.**